### TERESA A. FRECH ET AL. *v.* CARL F. PIONTKOWSKI ET AL.
### (SC 18400)

Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.

---

Argued December 4, 2009—officially released May 4, 2010

*Brian R. Smith*, with whom was *Maria T. Ackley* and, on the brief, *Richard D. Carella*, for the appellants (defendants).

*John S. Bennet*, for the appellees (plaintiffs).

*Opinion*

McLACHLAN J. This appeal concerns whether an abutting landowner may acquire a prescriptive easement for recreational use over a nonnavigable, artificial body of water. The defendants, Carl F. Piontkowski, Florence Baron and the estate of Constance Murray, appeal[1] from the judgment of the trial court, rendered following a trial to the court, finding that the plaintiffs, Teresa A. Frech, Kenneth Andersen and Amy Andersen, had acquired a prescriptive easement for noncommer-

---

[1] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

cial recreational purposes, including boating, swimming, fishing and skating over the Obed Heights Reservoir (reservoir), which is owned by the defendants, and that the plaintiffs held record title to disputed land abutting the edge of the reservoir, or, in the alternative, that the plaintiffs had acquired title to the disputed land by adverse possession. The defendants claim that the trial court improperly: (1) concluded that as a matter of law an abutting landowner may acquire a prescriptive easement over a nonnavigable, artificial body of water for recreational purposes; (2) concluded that the plaintiffs had established all of the requisite elements to acquire such prescriptive easement; (3) excluded the defendants' expert testimony regarding the extent of the burden imposed on the servient estate by the easement, specifically, the cost of maintaining the reservoir dam;[2] (4) rejected the conclusion of the defendants' expert regarding the boundaries of the plaintiffs' properties; and (5) concluded that the defendants could not prevail on their trespass claim in light of the court's conclusions that the plaintiffs had acquired a prescriptive easement over the reservoir and that the boundaries of the plaintiffs' respective properties extended to the edge of the water.[3] We affirm the judgment of the trial court.

The trial court found the following facts. The dispute centers around the reservoir and portions of the land surrounding it, which are located in the town of Old Saybrook. The reservoir was created in 1890 by the erection of a dam on the property currently owned by the defendants, twenty-five feet in height from the bottom of a brook situated on the property. The original purpose of the dam was to provide water to the water towers serving the steam locomotives at the Old Saybrook Railroad Junction.

[2] See footnote 10 of this opinion.
[3] See footnote 16 of this opinion.

The defendants own the reservoir and the land under it, and the plaintiffs each own land abutting the reservoir in a subdivision that was approved in 1974, but the exact boundary between the reservoir and the abutting properties and the ownership of that land was the subject of dispute at trial. Frech has owned lot 10 of the subdivision since 1977,[4] and the Andersens have owned lot 11 since they acquired the property from their predecessor in title, John Marzano, in 1997. Marzano had acquired lot 11 in 1979.

Over the course of more than twenty-five years, the Frech family, the Andersen family and the Marzano family had used the whole of the reservoir for recreational purposes, including boating, swimming, fishing, ice-skating and ice fishing. The Frech family had placed wooden pallets on lot 10 at the water's edge to facilitate access to their boat from the land. The Marzano family had built a sandy beach on the edge of lot 11 leading into the reservoir, with sand that had been delivered to the property by truck. Like the Frech family, the Andersen family kept a boat and they and their guests used it over the entire reservoir. The defendants had not given them permission to use the reservoir for these purposes, and neither the plaintiffs nor the Marzano family had asked for permission. When the defendants placed "No Trespassing" signs in the water near lots 10 and 11, the plaintiffs removed the signs.

---

[4] Frech owned lot 10 with her now deceased husband, Robert Frech. In determining whether the plaintiffs had established a prescriptive easement over the reservoir and acquired the disputed portions of land immediately abutting the reservoir by adverse possession, the trial court relied on the use made of the reservoir and the land abutting it not only by Frech, but also by her husband and her children. For the sake of convenience, we refer to Frech, her husband and children as the Frech family. For similar reasons, we refer collectively to the Andersen family and the Marzano family in describing their use of the reservoir and the portions of land immediately abutting it.

The plaintiffs brought this action pursuant to General Statutes § 47-31,[5] claiming that they had acquired a prescriptive easement over the reservoir for recreational purposes. The amended revised complaint sought an order of the court declaring that the plaintiffs had acquired the right to use the reservoir for said purposes, and a temporary and permanent injunction prohibiting the defendants from interfering with the exercise of those rights. The defendants filed a counterclaim seeking to quiet title with respect to the reservoir and the disputed land between the edge of the reservoir and the boundaries of the plaintiffs' properties, and alleging trespass as to all of the plaintiffs.[6] The counterclaim also sought a judgment declaring the rights of the parties to the land and the water and settling title thereto in the defendants, damages, and a permanent injunction prohibiting the plaintiffs from trespassing on the defendants' property. Following a trial, on the basis of its factual findings, the trial court concluded that the plaintiffs had proved that they had acquired a prescriptive easement over the reservoir, and that they respectively held record title to the disputed portions of land on lots 10 and 11 leading up to the edge of the water, or, in the alternative, had proven by clear and convincing evidence that they had acquired title in the same by adverse possession. This appeal followed.

[5] General Statutes § 47-31 (a) provides: "An action may be brought by any person claiming title to, or any interest in, real or personal property, or both, against any person who may claim to own the property, or any part of it, or to have any estate in it, either in fee, for years, for life or in reversion or remainder, or to have any interest in the property, or any lien or encumbrance on it, adverse to the plaintiff, or against any person in whom the land records disclose any interest, lien, claim or title conflicting with the plaintiff's claim, title or interest, for the purpose of determining such adverse estate, interest or claim, and to clear up all doubts and disputes and to quiet and settle the title to the property. Such action may be brought whether or not the plaintiff is entitled to the immediate or exclusive possession of the property."

[6] The defendants also alleged slander of title, but subsequently withdrew that count.

I

We first address the defendants' claim that the trial court improperly concluded as a matter of law that an abutting landowner may acquire a prescriptive easement for recreational purposes with respect to a nonnavigable, artificial body of water. The defendants appear to rely on two separate arguments in support of their contention that an abutting landowner should not be allowed to acquire such an easement. First, they contend that the acquisition of an easement over an artificial body of water imposes too great a burden on the servient estate by imposing on the owner the duty to maintain the artificial body of water—in the present case, by maintaining the dam. Second, they argue that the acquisition of an easement for recreational purposes over water presents notice issues that do not exist with respect to easements acquired over land, or easements for commercial purposes over water. In response, the plaintiffs rely on our decisions in *Ace Equipment Sales, Inc.* v. *Buccino*, 273 Conn. 217, 869 A.2d 626 (2005), and *Waterbury* v. *Washington*, 260 Conn. 506, 800 A.2d 1102 (2002), to argue that for purposes of acquiring an easement by prescription, the reservoir in the present case is treated identically to a parcel of land. We agree with the plaintiffs.

This issue presents a question of law, over which our review is plenary. See, e.g., *BNY Western Trust* v. *Roman*, 295 Conn. 194, 210, 990 A.2d 853 (2010). "[General Statutes §] 47-37 provides for the acquisition of an easement by adverse use, or prescription. That section provides: No person may acquire a right-of-way or any other easement from, in, upon or over the land of another, by the adverse use or enjoyment thereof, unless the use has been continued uninterrupted for fifteen years. In applying that section, this court repeatedly has explained that [a] party claiming to have acquired an easement by prescription must demon-

strate that the use [of the property] has been open, visible, continuous and uninterrupted for fifteen years and made under a claim of right." (Internal quotation marks omitted.) *Slack* v. *Greene*, 294 Conn. 418, 427, 984 A.2d 734 (2009).

Our decisions are consistent with the general rule that title may be acquired against riparian or littoral owners by prescription. 1 R. Beck, Waters and Water Rights (1991 Ed.) § 7.04 (c), p. 304. In *Waterbury* v. *Washington,* supra, 260 Conn. 584, for example, this court concluded that the city of Waterbury had established a prescriptive easement over the defendants' riparian rights to the Shepaug River.[7] Waterbury had acquired the easement through its use, since 1933, of the Shepaug dam to dam the Shepaug River to create the Shepaug reservoir, which Waterbury used as part of its public water supply. Id., 577–78. The trial court had concluded that, because Waterbury had not, until 1988 and 1989, diverted significant volumes of water from the Shepaug River for its public water supply; id., 579; Waterbury's use of the river had not been sufficiently " 'open and visible as a cause of low flow in the river' " to establish a prescriptive easement. Id., 577–78. We reversed the judgment of the trial court, concluding that the presence of the Shepaug dam constituted sufficient notice to the defendants "to satisfy the open and visible requirement necessary to establish a prescriptive easement." Id., 580.

We never have stated that a different rule might apply with respect to artificially created bodies of water to which littoral or riparian rights do not attach.[8] On the

---

[7] The defendants against whom Waterbury had acquired a prescriptive easement included the town of Roxbury, the Roxbury Land Trust, Inc., the Shepaug River Association, Inc., and the Steep Rock Association, Inc. By contrast, this court concluded that Waterbury had not established a prescriptive easement as against the town of Washington. *Waterbury* v. *Washington,* supra, 260 Conn. 584.

[8] We explained in *Buccino* that "[h]istorically, property rights in lakes were significantly different from property rights in streams, and each had

contrary, in *Ace Equipment Sales, Inc.* v. *Buccino*, supra, 273 Conn. 229, we stated that the property rights to an artificially created nonnavigable pond were governed not by riparian rights, but by the same rules governing title to "any other portion of . . . real estate . . . ." (Internal quotation marks omitted.) In that case, we concluded that abutting landowners did not have a riparian right to use a nonnavigable pond for recreational purposes when the majority of the land beneath the pond was owned by another party. Id., 232. In so concluding, we relied on the fact that the owners of the land beneath the pond held ownership to the property in severalty as opposed to littoral ownership. Id., 227–28. In such a case, the owner of the land beneath the water owns the land in accordance with the description of the boundary lines set forth in the deed by metes and bounds.[9] Id., 227 n.8. Because such a property is governed not by riparian rights, but by the same principles governing title to a parcel of land, we concluded that the plaintiffs, the owners of the land beneath the pond, had the right to exclude the defendants, who had claimed riparian rights to use the pond for recreational purposes. Id., 229, 232.

In the present case, although the defendants' deed does not describe the lake by metes and bounds, it is undisputed that they own all of the land underlying the reservoir. Accordingly, the same principle that guided

a different name. 1 R. Beck, Waters and Water Rights (2001 Replacement Volume) § 6.02 (b), p. 6-99. Rights in streams were 'riparian,' while rights in lakes were 'littoral.' Id. Although rights in the Great Lakes, and other large bodies of standing water still are treated differently from the rights of owners along the shore of smaller lakes or ponds in some jurisdictions, the two terms generally have merged and the term 'riparian right' is now considered to encompass both types. Id., pp. 6-99 through 6-100." *Ace Equipment Sales, Inc.* v. *Buccino*, supra, 273 Conn. 228 n.9.

[9] By contrast, "each littoral owner impliedly owns the land under the water to the center of the body and each abutting owner is entitled to common use of the entire body." *Ace Equipment Sales, Inc.* v. *Buccino*, supra, 273 Conn. 227 n.8.

our analysis in *Buccino* applies in the present case—that is, the title to the reservoir is governed by the same principles that govern a parcel of land. Therefore, it is possible, as a matter of law, for an abutting landowner to acquire a prescriptive easement over the reservoir.

The defendants' contention that the rules of prescriptive easement are inapplicable under the facts of the present case as a matter of law because of the "unique burden" imposed on the servient estate of maintaining the dam is not persuasive. The defendants rely on the principle that "one who has an easement by prescription has the right to do such acts that are reasonable and necessary to effectuate the party's enjoyment of the easement unless it unreasonably increases the burden on the servient tenement." *McCullough* v. *Waterfront Park Assn., Inc.*, 32 Conn. App. 746, 756, 630 A.2d 1372, cert. denied, 227 Conn. 933, 632 A.2d 707 (1993). This principle, however, is relevant to the *scope* of an easement that has been acquired by prescription, and not to whether an easement may or may not be acquired as a matter of law. Id., 755–56. Moreover, the extent to which the servient estate will be burdened by the easement is at best unclear, because at oral argument the plaintiffs contested the premise relied upon by the defendants, namely, that the establishment of the easement in favor of the plaintiffs obligates the defendants to maintain the dam in perpetuity.[10]

The defendants' second argument, that the type of prescriptive easement at issue in the present case, namely, one for recreational purposes, may not be acquired as a matter of law with respect to a body of

---

[10] In fact, during oral argument before this court, the plaintiffs stipulated that the defendants are not obligated to maintain the dam in perpetuity. The only right they claim with respect to the maintenance of the dam as a result of their prescriptive easement is *their* right to repair the dam if such need should arise. The plaintiffs' stipulation renders it unnecessary for us to consider the defendants' claim that the trial court improperly precluded the testimony of the defendants' expert as to the cost of maintaining the dam.

water, is also unavailing. The defendants contend that recreational uses of a body of water are too intermittent and do not leave adequate traces to offer sufficient notice. The defendants argue that the lack of sufficient notice is inconsistent with a conclusion that the adverse use was open. Whether the elements of a prescriptive easement have been proven in a particular case, however, presents a question of fact. *South Norwalk Lodge* v. *Palco Hats, Inc.*, 140 Conn. 370, 373–74, 100 A.2d 735 (1953). The defendants' argument, therefore, goes to whether there was sufficient evidence to support the trial court's factual finding that the plaintiffs' use was open, but does not call into question whether an easement by prescription for recreational purposes may be acquired as a matter of law.[11]

## II

We next address the defendants' claim that there was insufficient evidence to support the trial court's finding

---

[11] The defendants cite two decisions from other jurisdictions as persuasive authority for the proposition that an easement for recreational purposes may not be acquired by prescription. The defendants refer to language in *Miller* v. *Lutheran Conference & Camp Assn.*, 331 Pa. 241, 248, 200 A. 646 (1938), in which the court addressed whether an easement in gross for recreational use of a lake could arise by prescription. In that context, the court stated that "[c]ertainly the casual use of a lake during a few months each year for boating and fishing could not develop into a title to such privileges by prescription." Id. Even if the present case involved an easement in gross, which it does not, the quoted language does not stand for the proposition that *as a matter of law* easements for recreational purposes may never be acquired by prescription. Similarly, the defendants rely on a decision by the Supreme Court of Ohio in which that court declined to conclude that a prescriptive easement for recreational use by the public had been established as to a nonnavigable, privately owned lake. *Lembeck* v. *Nye*, 47 Ohio St. 336, 353, 24 N.E. 686 (1890). That decision is only remotely related to the issues before the court in the present case. The easement at issue in *Lembeck* was for public use and the court specifically stated that the type of easement sought *could* be acquired by prescription, but that the necessary factual showing had not been met in that case. Id. The defendants fail to cite any relevant authority for the proposition that an easement over a body of water for recreational purposes may not be acquired by prescription as a matter of law.

that the plaintiffs had acquired the prescriptive easement. Specifically, the defendants contend that the trial court improperly concluded that the plaintiffs proved that they had used the reservoir under a claim of right, that the plaintiffs' use of the reservoir was open and notorious, and that the plaintiffs' use of the reservoir was continuous and uninterrupted for a period of fifteen years. Our review of the record reveals that there is sufficient evidence to support the trial court's factual findings.

"Whether a right of way by prescription has been acquired presents primarily a question of fact for the trier after the nature and character of the use and the surrounding circumstances have been considered. . . . When the factual basis of a trial court's decision [regarding the existence of a prescriptive easement] is challenged, our function is to determine whether, in light of the pleadings and evidence in the whole record, these findings of fact are clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *Slack* v. *Greene*, supra, 294 Conn. 426–27.

"The burden is on the party claiming a prescriptive easement to prove all of the elements by a preponderance of the evidence." *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 125, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006). As we already have stated in this opinion, "[a] party claiming to have acquired an easement by prescription must demonstrate that the use [of the property] has been open, visible, continuous and

uninterrupted for fifteen years and made under a claim of right. . . . The purpose of the open and visible requirement is to give the owner of the servient land knowledge and full opportunity to assert his own rights. . . . To satisfy this requirement, the adverse use must be made in such a way that a reasonably diligent owner would learn of its existence, nature, and extent. Open generally means that the use is not made in secret or stealthily. It may also mean that it is visible or apparent. . . . An openly visible and apparent use satisfies the requirement even if the neighbors have no actual knowledge of it. A use that is not open but is so widely known in the community that the owner should be aware of it also satisfies the requirement. . . . Concealed . . . usage cannot serve as the basis of a prescriptive claim because it does not put the landowner on notice. . . . A typical example of such a concealed use involves an asserted easement in an underground sewer or pipeline." (Citations omitted; internal quotation marks omitted.) *Waterbury* v. *Washington,* supra, 260 Conn. 577.

In its memorandum of decision, the trial court in the present case found that the plaintiffs and their predecessors in title "have used the whole of [the] [r]eservoir . . . in an open, visible, continuous and uninterrupted manner, under a claim of right. Such use has been made without license or permission, and without recognition of any rights in the defendants to prevent this use." The court specifically relied on the following evidence adduced at trial with respect to the Frech family's use of the reservoir since their purchase of lot 10 in 1977, and the use of the reservoir by the Andersen and Marzano families cumulatively, since the purchase of lot 11 by the Marzano family in 1979. The Frech family regularly used the reservoir for boating, swimming, fishing, ice-skating and ice fishing. They placed wooden pallets at the water's edge to allow easier access to their boat. They used the reservoir for recreational pur-

poses not only for themselves, but also for their friends and relatives. The Marzano family used the reservoir for boating, swimming, skating and fishing the entire time that they lived on the property. They used a truck to bring in a large amount of sand to create a beach on the portion of their property leading into the reservoir. After the Andersens purchased lot 11, their family used their boat over the entire reservoir, and allowed their guests to use their boat, fishing rods and recreational equipment. They used the reservoir frequently for swimming, boating, fishing, "boogie boarding" and floating. When the defendants posted "No Trespassing" signs in the water near lots 10 and 11, the Frech and Andersen families removed the signs. The court further found that the use of the reservoir by the plaintiffs and the Marzano family was such that a reasonably diligent owner would have learned of its existence, nature and extent. The court's findings are sufficient to support its determination that the plaintiffs' use was open and notorious.[12]

---

[12] In arguing that the evidence was insufficient to support the trial court's conclusion, the defendants point to the testimony of Carl Piontkowski that he could not see the plaintiffs' properties from his home and also rely on the fact that there was no evidence that the plaintiffs had erected a permanent wharf or dock in the water. Although such evidence is relevant to our review of the whole record, it falls far short of leaving us "with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Slack* v. *Greene*, supra, 294 Conn. 427. The defendants' evidence that they could not see the plaintiffs' properties from their home is an insufficient basis upon which to challenge the trial court's determination. The defendants cite to no authority for the suggestion that a property owner's inability to view a portion of his property from his house excuses the property owner's duty to exercise reasonable diligence in protecting his interest. Moreover, the plaintiffs did not testify that their use of the reservoir was confined to the portion of it immediately adjoining the plaintiffs' properties. On the contrary, the plaintiffs testified and the court found that they used the entire reservoir. The trial court was free to infer that a reasonably diligent owner would have observed the plaintiffs' use of the reservoir. Similarly, the defendants' reliance on the lack of permanent structures leading into the water from their properties does not leave us with the conviction that a mistake was made. The defendants cite to no authority requiring the erection of permanent structures in order to satisfy the openness require-

The requirement that the use be continuous is satisfied if it is proven that the use was uninterrupted for a period of at least fifteen years. General Statutes § 47-37. The court found that the Frech and Marzano families began using the reservoir immediately upon purchasing their respective properties in 1977 and 1979, that the Andersen family continued using the reservoir when they purchased lot 11 from the Marzano family, and that the use had continued without interruption up to the time of trial. The defendants contend that because the use of the reservoir was not constant, it was not continuous. The defendants point to testimony that the Frech family did not use their boat every year, and, in years that the boat was used, took the boat out about two or three times per month. Boating, however, was only one of several recreational uses that the plaintiffs made of the reservoir. They also swam, fished, skated and went ice fishing. The frequency of the boat use, therefore, is only one measure of the frequency of the use that the plaintiffs made of the reservoir. Moreover, we never have imposed a requirement that use must be constant in order to satisfy the requirement that use be continuous. See *Roche* v. *Fairfield*, 186 Conn. 490, 501 n.11, 442 A.2d 911 (1982) (recognizing that seasonal use is sufficient to satisfy continuity requirement). Finally, we have stated that "[i]t is axiomatic that, in determining whether a prescriptive easement has vested, the nature of the easement will dictate the type of evidence that is required to prove it." *Slack* v. *Greene*, supra, 294 Conn. 429. The plaintiffs claimed, and the trial court found that they had proven, that they had acquired a prescriptive easement for recreational purposes. To require proof of daily or constant use for a recreational easement ignores the type of easement at issue. The evidence was sufficient to support the trial court's determination that the use was continuous.

ment. Even if there were such a requirement, surely the construction of a beach on lot 11 would satisfy it.

The defendants contend that their actions were sufficient to interrupt the plaintiffs' use of the reservoir. Specifically, the defendants rely on testimony that Matthew Frech, the son of Teresa Frech, was ejected from the property by the defendants on two occasions. Mark Piontkowski, the son of Carl Piontkowski, testified that if he saw people using the water in front of the plaintiffs' properties, he asked them to leave. The defendants also presented testimony that they sent a letter to the plaintiffs objecting to a satellite dish that had been placed on the Andersen property and that they had posted "No Trespassing" signs by the reservoir on more than one occasion The trial court found that these actions by the defendants were not sufficient to interrupt the plaintiffs' continuous use of the reservoir. This finding is consistent with General Statutes § 47-38, which provides: "The owner of land over which a right-of-way or other easement is claimed or used may give notice in writing, to the person claiming or using the privilege, of his intention to dispute the right-of-way or other easement and to prevent the other party from acquiring the right; and the notice, being served and recorded as provided in sections 47-39 and 47-40, shall be deemed an interruption of the use and shall prevent the acquiring of a right thereto by the continuance of the use for any length of time thereafter." None of the defendants' actions satisfy the requirements of § 47-38, and the evidence is sufficient to support the trial court's finding that the plaintiffs' use was uninterrupted.[13]

The defendants also contend that there was insufficient evidence to support the trial court's determination that the plaintiffs had used the reservoir under a claim of right. "The requirement that the [use] must be exercised under a claim of right does not necessitate proof of a

[13] The question of whether a landowner *must* satisfy the requirements of § 47-38 in order to establish interruption of continuous use is not before us and we do not address it.

claim actually made and brought to the attention of the owner . . . . It means nothing more than a [use] as of right, that is, without recognition of the right of the landowner, and that phraseology more accurately describes it than to say that it must be under a claim of right. . . . [When] there is no proof of an express permission from the owner of the servient estate, on the one hand, or of an express claim of right by the person or persons using the way, on the other, the character of the [use], whether adverse or permissive, can be determined as an inference from the circumstances of the parties and the nature of the [use]. . . . A trier has a wide latitude in drawing an inference that a [use] was under a claim of right." (Citation omitted; internal quotation marks omitted.) *Slack* v. *Greene*, supra, 294 Conn. 428.

There was no testimony presented that the plaintiffs asked for, or were given permission to use the reservoir and the evidence presented of their conduct with respect to the reservoir supported the trial court's determination that they used the reservoir under a claim of right. When the defendants placed "No Trespassing" signs in the water near the plaintiffs' properties, the plaintiffs removed the signs. They used the entire reservoir without receiving permission to do so, and did not respond to the defendants' intermittent attempts to prevent them from using the reservoir. The defendants rely on two pieces of evidence in claiming that there was insufficient evidence from which the trial court could conclude that the plaintiffs used the reservoir under a claim of right. First, they rely on the testimony of Mark Piontkowski that Robert Frech had specifically asked for permission to use the reservoir. As the fact finder, however, the trial court was not obligated to credit that testimony. Second, they rely on testimony that the plaintiffs inquired about joining the beach asso-

ciation.[14] The uncontroverted testimony at trial, however, was that, although some of the plaintiffs took some steps toward joining the beach association, none of them ultimately joined. The defendants essentially argue that because the plaintiffs considered, and rejected, the option of paying the defendants to use the reservoir, there was insufficient evidence that the plaintiffs used the reservoir under a claim of right. On the contrary, the plaintiffs' rejection of the beach association as an option after exploring that possibility supports the trial court's conclusion that the plaintiffs did not recognize the defendants' authority to exclude them from the reservoir.

## III

The defendants next claim that the trial court improperly rejected the conclusion of the defendants' expert as to the boundaries of the plaintiffs' properties. We disagree.

In their counterclaim, the defendants had alleged that the boundary of their property extended past the edge of the reservoir as determined by current water levels and that the boundaries of the plaintiffs' properties did not extend to the current edge of the water. Therefore, the defendants claimed that the plaintiffs unlawfully entered upon their land. At trial, the defendants' expert, Robert Bascom, a land surveyor, relied on various deeds, dating from 1888 to the present, describing the defendants' property as being "land [that] will be flowed by a dam [twenty-five] feet in height from the bottom of a brook situated on land formerly of George M. Denison at a point selected by S.W. Searle, C.E., on his survey of said land for a dam to be erected for the Old Saybrook Water Company." On the basis of that

---

[14] The beach association is a group to which the defendants lease land adjacent to the reservoir. The group members pay for the right to use the reservoir.

description and his surveys of the land, Bascom prepared the map on which the defendants relied to describe the boundaries between their property and the plaintiffs' properties. According to that map and Bascom's testimony consistent with the map, the plaintiffs' properties did not reach the edge of the water of the reservoir.

The trial court rejected Bascom's conclusion because the court found that Bascom's conclusions rested on the assumption that his estimation of the location of the "bottom of the brook," on which the reliability of his survey relied, was accurate. Searle's survey, however, was not on record, and was not presented in evidence. Therefore, the court concluded that the defendants had failed to prove that Bascom's estimation of the location of the "bottom of the brook" referenced in the deed was anything more than speculation. The court found that the more persuasive evidence presented as to the boundaries of the defendants' and plaintiffs' properties was the subdivision map offered by the plaintiffs, which supported the court's finding that the boundaries of lots 10 and 11 extended to the edge of the reservoir at its current water level.[15] The court was entitled to credit or discredit Bascom's testimony. The defendants' argument appears to rest on the fact that the plaintiffs did not present expert testimony to controvert Bascom's testimony. In evaluating Bascom's testimony, however, the trial court was not limited only to testimony offered by other expert witnesses. It permissibly considered other evidence offered at trial, including the subdivision map, the accuracy of which the trial court specifically noted was supported by other maps that had been admitted into evidence. The court acted within its discretion in declining to credit Bascom's testimony

[15] The court also observed that the water level of the reservoir never had been higher than it was at the time of trial, since the water was at the highest level allowed by the dam spillway.

in arriving at its conclusion that the plaintiffs' properties were directly bounded by the edge of the reservoir.[16] As the fact finder, it was free to reject the testimony, even if that testimony had been uncontradicted. *Barrila* v. *Blake*, 190 Conn. 631, 639, 461 A.2d 1375 (1983). Accordingly, we reject this claim.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[16] In light of our conclusions that the trial court properly found that the plaintiffs had acquired a prescriptive easement over the reservoir and that the plaintiffs held title to the land on lots 10 and 11 up to the edge of the reservoir, we also conclude that the trial court properly concluded that the defendants could not prevail on their trespass claim.