******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## EUGENIO PIRRI *v.* CHEN CHUNG CHOW ET AL.
### (AC 46974)

Bright, C. J., and Cradle and Seeley, Js.*

*Syllabus*

The defendant appealed from the trial court's judgment rendered in favor of the substitute plaintiff, the executor of the plaintiff's estate, on her claim of adverse possession with respect to a portion of the defendant's property. The defendant claimed that the trial court clearly erred in finding that the plaintiff had adversely possessed the disputed area under a claim of right. *Held*:

Although the trial court's finding that the plaintiff had installed a new fence at the edge of the disputed area shortly after 1985 was clearly erroneous, the error was harmless because the court made only a single reference in its opinion to the fence being erected in 1985, it in no way suggested that such fact was central to its analysis or impacted its findings as to other facts, and the other evidence in the record demonstrated that the plaintiff used the disputed area as his own without permission from the record owner continuously from 1985 to 2018.

The trial court's finding that the plaintiff possessed the disputed area under a claim of right was not clearly erroneous because the evidence was sufficient to support the finding, and it was not the role of this court to second-guess the trial court's credibility determinations or to reweigh conflicting evidence.

Argued January 9—officially released March 25, 2025

*Procedural History*

Action seeking to quiet title to certain real property, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the defendant American Mortgage Corporation, as trustee, was defaulted for failure to appear; thereafter, Mong Chin Liu was substituted as the party defendant; subsequently, Rosaria Pirri, executor of the estate of the plaintiff, was substituted as the party plaintiff; thereafter, the substitute defendant filed a counterclaim; subsequently, the case was tried to the court, *Hon. Kevin Tierney*, judge trial

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

referee; judgment for the substitute plaintiff, from which the substitute defendant appealed to this court. *Affirmed.*

*Thomas M. Cassone*, for the appellant (substitute defendant).

*Catherine R. Keenan*, with whom, on the brief, was *Philip Russell*, for the appellee (substitute plaintiff).

*Opinion*

CRADLE, J. The substitute defendant, Mong Chin Liu, appeals from the judgment of the trial court rendered in favor of the substitute plaintiff, Rosaria Pirri, executor of the estate of the plaintiff, Eugenio Pirri, on her claim of adverse possession with respect to a portion of the substitute defendant's property (disputed area).[1] On appeal, the substitute defendant claims that the trial court clearly erred in finding that the plaintiff adversely possessed the disputed area under a claim of right. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to this appeal. In January, 1985, the plaintiff purchased the real property located at 31 Edgewood Avenue in Greenwich, which he owned until his death in April, 2022.[2] In December, 2018, Chen Chung Chow (defendant) purchased the real property located at 52 Oak Ridge Street in Greenwich, which abuts the rear yard area of the plaintiff's property,

---

[1] In the original complaint, the plaintiff named Chen Chung Chow and American Mortgage Corporation, as trustee, as defendants. At that time, Chow was the record owner of the disputed area. Thereafter, Chow quitclaimed his interest in the real property to his wife, the substitute defendant, and the court granted the plaintiff's motion to substitute her as the party defendant. On October 22, 2020, American Mortgage Corporation, as trustee, was defaulted for failure to appear, and it has not participated in this appeal. Accordingly, in this opinion, we refer to Chow alone as the defendant.

[2] The plaintiff and his wife, the substitute plaintiff, jointly purchased 31 Edgewood Avenue on January 18, 1985. On February 11, 2000, the substitute plaintiff quitclaimed her interest in the property to the plaintiff.

from the estate of Netta F. Evans.[3] Although the properties are adjacent, there is a "marked topographical change between the Oak Ridge Street lot and the Edgewood Avenue lot." Specifically, 31 Edgewood Avenue sits atop a steep cliff, making it approximately forty feet higher in elevation than 52 Oak Ridge Street. The disputed area is a 1715 square foot, level tract of land that is part of the rear portion of the 52 Oak Ridge Street property but is "located at the top of [the] cliff" and, therefore, is topographically level with the 31 Edgewood Avenue property. Because of its elevation, "[t]he disputed area is effectively landlocked from the remainder of the 52 Oak Ridge Street lot," in that "the only reasonable access to the disputed area is either through the [plaintiff's] property . . . or that of his immediate Edgewood Avenue neighbor . . . ."

After the plaintiff purchased 31 Edgewood Avenue, he began using the property as the headquarters and storage facility for his landscaping business.[4] "Shortly after his 1985 purchase, [the plaintiff] installed . . . asphalt in the disputed area . . . utilizing his own labor. Later . . . asphalt was installed professionally by another contractor." "The [plaintiff and the substitute plaintiff] at their own cost and expense installed a new iron type chain-link fence at the cliff edge of the disputed area shortly after 1985." They later installed a new fence in the same area in 2019. Between January, 1985, and the plaintiff's retirement from landscaping in 2018, the plaintiff used the disputed area "consistently as a construction facility for [the plaintiff's] landscaping business" and to store various landscaping equipment

---

[3] It is undisputed that Netta F. Evans owned 52 Oak Ridge Street prior to the plaintiff's purchase of 31 Edgewood Avenue in 1985 and until her death in September, 2017.

[4] The plaintiff never lived in the residential home on the property, which he used as "a multifamily rental house," but "[t]he shed, garage and extensions thereof located at the rear of 31 Edgewood Avenue directly on the property line . . . were used by [the plaintiff] for his landscaping business."

and supplies.[5] The plaintiff and his employees parked their vehicles in the disputed area "every business day . . . ." Additionally, "[f]or a . . . portion of those thirty-three years, the disputed area was jointly used by [the plaintiff's son] Eugenio Pirri, Jr. [(Pirri)]," for his own landscaping business. The disputed area provided the only vehicle access to the rear lot of the adjacent property, 27 Edgewood Avenue, which Pirri leased and used for his landscaping business. "[Pirri] and his employees, as well as suppliers, used that access multiple times every day."

On July 10, 2019, the plaintiff commenced the underlying action against the defendant, alleging adverse possession of the disputed area and seeking a judgment quieting title thereto in his favor. The defendant asserted as a special defense to the claim of adverse possession that any use of his property alleged by the plaintiff was "permissive in nature."[6] The defendant subsequently quitclaimed title to 52 Oak Ridge Street to the substitute defendant. On September 3, 2021, the plaintiff filed a motion to substitute her as the party defendant, and, on September 20, 2021, the court, *Krumeich, J.*, ordered that she be substituted as the party defendant without objection. The case was tried remotely before the court, *Hon. Kevin Tierney*, judge trial referee, over six days, commencing on November 17, 2021, and concluding on

---

[5] Specifically, "the following items were located within the disputed area: fence posts, wheel barrows, lawn mowers, scaffolding to hold various items of equipment, scrap wood, a snow blower, a leaf vacuum machine (giraffe), small construction material, a plow, a leaf blower, grass seed, Belgian blocks, a leaf vacuum, construction hardware, bricks, a skid skier machine with a large exhaust system, multiple snow plows, construction material, equipment to attach the snow plows to vehicles, worker's vehicles, a mixer, road salt, a pile of sand, a ladder, landscaping supplies, a bobcat vehicle, covers and tarps for equipment, and salted winter sand."

[6] The defendant also asserted as a second special defense that "[t]he plaintiff comes to court with unclean hands" insofar as he had been using the disputed area for "an illegal commercial purpose . . . ." This second special defense was withdrawn prior to trial.

January 6, 2023.[7] Prior to the conclusion of trial, on April 3, 2022, the plaintiff died.[8] On October 20, 2022, the court ordered that the substitute plaintiff, in her capacity as executor of the plaintiff's estate, be substituted as a party plaintiff without objection.[9]

Thereafter, the court rendered judgment quieting title to the disputed area in favor of the substitute plaintiff. In its September 20, 2023 memorandum of decision, the court made the following factual findings. "When the [plaintiff and the substitute plaintiff] first purchased 31 Edgewood Avenue in January, 1985, they believed that the disputed area was a portion of their property . . . . It was not until fifteen years [had] passed that [the substitute plaintiff] found out that the disputed area" was not part of 31 Edgewood Avenue. "There was no evidence of any interruption of [the plaintiff's] uses of the disputed area from January, 1985, to his 2018 retirement." "[The plaintiff] never asked anyone for permission to use the disputed area for his landscaping business and the improvements he made in the disputed area. . . . There is no evidence that [the defendant, the substitute defendant, or Netta F. Evans, their predecessor in title] ever expended any funds or made any

[7] We note that the court stated in its memorandum of decision that "[t]he trial was delayed due to periodic inaccessibility to the remote court machinery, COVID[-19], and the death of [the plaintiff]."

[8] The plaintiff had testified as a witness on his own behalf but died prior to the conclusion of his cross-examination by the substitute defendant's attorney. "Both [substitute] parties stipulated on the record [however] that [the] court [could] consider the [plaintiff's] direct and partial cross-examination testimony and all exhibits offered during [the plaintiff's] trial examination."

[9] The substitute pleadings filed by the parties were substantively the same as the original pleadings. Specifically, the substitute plaintiff filed a substitute complaint alleging adverse possession of the disputed area and seeking the same relief as the plaintiff's original complaint. The substitute defendant subsequently filed an answer denying that allegation and asserted the same special defense of permissive use as the defendant. In addition, the substitute defendant for the first time counterclaimed and sought a judgment quieting title to the disputed area in her favor.

improvements to or on the disputed area . . . . All the evidence indicates that the only persons who expended any funds or labor to make improvements in the disputed area were [the plaintiff and the substitute plaintiff].

\* \* \*

"There is no evidence that any of the three owners of 52 Oak Ridge Street ever entered . . . the disputed area or 31 Edgewood Avenue or ever asked any members of the [plaintiff's] family to use all or a part of the disputed area." (Citations omitted.) Accordingly, the court found that "[the plaintiff] obtained title to the disputed area by adverse possession in January, 2000."

The court further rejected the substitute defendant's special defense of permissive use, stating: "There is no direct evidence of permission . . . by the prior title owner of 52 Oak Ridge Street . . . Evans. Neither the successor owner, [the defendant], nor the current title owner, [the substitute defendant], ever executed any documents that granted [the plaintiff] the personal right, license, right-of-way or easement to use all or part of the disputed area. There is no direct evidence of any oral statements made by any of those three individuals regarding permission extended to [the plaintiff] to any portion of the disputed area. The evidence is silent as to the issue of permission." This appeal followed.

As a preliminary matter, we set forth the legal principles relevant to the substitute defendant's appeal. "[T]o establish title by adverse possession, the claimant must oust an owner of possession and keep such owner out without interruption for fifteen years by an open, visible and exclusive possession under a claim of right with the intent to use the property as his own and without the consent of the owner.[10] . . . A finding of adverse

_____

[10] On appeal, the substitute defendant does not contest that the plaintiff continuously possessed the disputed area for the required fifteen years, nor does she challenge the court's findings with respect to the open, visible, and exclusive elements of adverse possession.

possession is to be made out by clear and positive proof. . . . The burden of proof is on the party claiming adverse possession." (Footnote added; internal quotation marks omitted.) *Caminis* v. *Troy*, 300 Conn. 297, 311, 12 A.3d 984 (2011). "[C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *O'Connor* v. *Larocque*, 302 Conn. 562, 576, 31 A.3d 1 (2011).

"[A] claim of right does not necessarily mean that the adverse possessor claims that [he or she] is the proper titleholder, but that [he or she] has the intent to disregard the true owner's right to possession." (Internal quotation marks omitted.) *Eberhardt* v. *Imperial Construction Services, LLC*, 101 Conn. App. 762, 768, 923 A.2d 785, cert. denied, 284 Conn. 904, 931 A.2d 263 (2007). In other words, a claim of right requires that the party seeking title through adverse possession must "[manifest] her unequivocal intent to use the property as her own and without the consent of the owner." (Internal quotation marks omitted.) Id., 769. "An adverse possessor may interrupt his or her continuous possession by acting in a way that acknowledges the superiority of the real owner's title. . . . [T]he possession of one who recognizes or admits title in another, either by declaration or conduct, is not adverse to the title of such other. . . . Occupation must not only be hostile[11]

---

[11] "The word hostile, as employed in the law of adverse possession, is a term of art; it does not, despite some troublesome early cases, imply animosity, ill will or bad faith. Nor is the claimant required to make express declarations of adverse intent during the possessory period. . . . Hostile possession can be understood as possession that is opposed and antagonistic

in its inception, but it must continue hostile, and at all times during the required period of fifteen years challenge the right of the true owner . . . ." (Citation omitted; footnote added; internal quotation marks omitted.) *Allen* v. *Johnson*, 79 Conn. App. 740, 746, 831 A.2d 282, cert. denied, 266 Conn. 929, 837 A.2d 802 (2003).

In determining whether a claimant has satisfied the elements of adverse possession, "[t]he inquiry is necessarily fact specific and context dependent. In evaluating such claims, [t]he location and condition of the land [at issue] must be taken into consideration and the alleged acts of ownership must be understood as directed to those circumstances and conditions. . . . Additionally, in assessing whether hostility exists, the relation that the [alleged] adverse possessor occupies with reference to the owner is important." (Internal quotation marks omitted.) *Dowling* v. *Heirs of Bond*, 345 Conn. 119, 143–44, 282 A.3d 1201 (2022). "[When] there is no proof of an express permission from the [record owner of the property], on the one hand, or of an express claim of right by the person or persons using the [property], on the other, the character of the [use], whether adverse or permissive, can be determined as an inference from the circumstances of the parties and the nature of the [use]. . . . A trier has a wide latitude in drawing an inference that a [use] was under a claim of right." (Citation omitted; internal quotation marks omitted.) *Slack* v. *Greene*, 294 Conn. 418, 428, 984 A.2d 734 (2009).

Although evidence indicating a lack of permission is relevant to whether a claimant has established use under a claim of right, it is not incumbent on the claimant to prove a lack of permission. See *Lisiewski* v. *Seidel*, 72 Conn. App. 861, 873, 806 A.2d 1121, cert. denied, 262

---

to all other claims, and that conveys the clear message that the possessor intends to possess the land as his or her own." (Citation omitted; internal quotation marks omitted.) *Mulle* v. *McCauley*, 102 Conn. App. 803, 814, 927 A.2d 921, cert. denied, 284 Conn. 907, 931 A.2d 265 (2007).

Conn. 921, 812 A.2d 865 (2002), and cert. denied, 262 Conn. 922, 812 A.2d 865 (2002). "Such a rule would often charge a party with proving a negative." Id. Rather, "[w]hen the defendant raises permission by way of a special or affirmative defense, the burden of proof rests on the defendant . . . who must prove the special defense by a fair preponderance of the evidence." (Internal quotation marks omitted.) *Slack* v. *Greene*, supra, 294 Conn. 435.

Despite the substitute plaintiff's burden to prove her claim of adverse possession by clear and convincing evidence, "our scope of review is limited. . . . Because adverse possession is a question of fact for the trier . . . the court's findings as to this claim are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Citation omitted; internal quotation marks omitted.) *Mulle* v. *McCauley*, 102 Conn. App. 803, 809, 927 A.2d 921, cert. denied, 284 Conn. 907, 931 A.2d 265 (2007). "It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review." (Internal quotation marks omitted.) *Kiniry* v. *Kiniry*, 299 Conn. 308, 329, 9 A.3d 708 (2010). "In applying the clearly erroneous standard of review, [a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. . . . This distinction

accords with our duty as an appellate tribunal to review, and not to retry, the proceedings of the trial court." (Internal quotation marks omitted.) *O'Connor* v. *Larocque*, supra, 302 Conn. 575. "A trial court's findings in an adverse possession case, if supported by sufficient evidence, are binding on a reviewing court . . . ." (Internal quotation marks omitted.) *Mulle* v. *McCauley*, supra, 809.

Here, the substitute defendant raises several challenges to the court's finding that the plaintiff's possession was under a claim of right. We address each in turn.

I

The substitute defendant first claims that the court clearly erred in finding that "[t]he [plaintiff and the substitute plaintiff], at their own cost and expense, installed a new iron type chain-link fence at the cliff edge of the disputed area shortly after 1985." The substitute plaintiff concedes, and we agree, that there is no evidence in the record to support this finding.[12] Accordingly, we conclude that the court's finding with respect to the erection of a fence shortly after 1985 was clearly erroneous.[13]

---

[12] We note that the substitute plaintiff argues that the erroneous finding was "merely a scrivener's error and the trial court was referring to the 2019 fence." Her argument, although plausible, is unduly speculative. We are not convinced that the record before us is sufficient to support such a conclusion.

[13] The court found, and the record supports, that "[a] fallen down iron fence had existed at the top of the cliff since [the plaintiff and the substitute plaintiff] purchased the property on January 18, 1985." The court also found, and the record supports, that they installed a new fence along the edge of the cliff in 2019.

Our thorough review of the record, however, has disclosed no evidence indicating that the plaintiff and the substitute plaintiff had installed a new fence in the disputed area at any time prior to 2019. Rather, the substitute plaintiff testified: "[B]efore 1985, when we bought the house, there was a chain-link fence that was not up. It was down on the ground, so it was down there for so many years just like that . . . so it wasn't replaced. It wasn't repaired, but that chain-link fence was down there." She then confirmed that "[t]here was no chain-link fence installed upright [along the edge of the cliff] between 1985 and 2019." This testimony was corroborated

This conclusion with respect to the court's finding, however, does not end our inquiry, as we must examine the court's clearly erroneous finding to determine whether it was harmless. "[W]here . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's [fact-finding] process, a new hearing is required." (Internal quotation marks omitted.) *Osborn* v. *Waterbury*, 197 Conn. App. 476, 485, 232 A.3d 134 (2020), cert. denied, 336 Conn. 903, 242 A.3d 1010 (2021). The harmless error standard in a civil case requires us to determine whether the court's clearly erroneous factual finding would likely affect the result of the trial. See, e.g., *JPMorgan Chase Bank, National Assn.* v. *Lakner*, 347 Conn. 476, 496, 298 A.3d 249 (2023).

The substitute defendant argues that the erroneous finding was harmful because it constituted "the only act attributed by the trial court to the plaintiff that, if true, could have demonstrated" possession under a claim of right. We are not persuaded. Between January, 1985, and 2018, the plaintiff, along with his family and employees, consistently used the disputed area to store equipment and supplies, for parking, to traverse the property, and as a construction facility for his landscaping business. The evidence reflects that the plaintiff and Pirri exclusively maintained the disputed area, which included clearing snow during the winter and removing leaves during the fall. The plaintiff also installed asphalt within

by Roy Cary, a licensed land surveyor, who testified that, when he visited 31 Edgewood Avenue in 2017, there was no fence along the majority of the cliff edge apart from a small section of chain-link fence, and when he returned to the property in 2019, a new wire fence had been installed along the cliff edge.

the disputed area on two separate occasions. The court found, and the record supports, that the plaintiff never asked for or received permission to use, maintain, or improve the disputed area from any owner of 52 Oak Ridge Street.[14] The substitute defendant does not challenge the court's findings regarding the plaintiff's consistent use and maintenance of the disputed area. Additionally, she has not claimed that she or any other owner of 52 Oak Ridge Street ever tried to interfere with his use, nor has she or any other owner attempted to use, maintain, or access the disputed area themselves. Thus, although the plaintiff did not erect a fence within the disputed area shortly after 1985, the evidence demonstrates that the plaintiff used the disputed area as his own, without permission from the record owner, continuously from 1985 to 2018. Accordingly, we conclude that the court's erroneous finding with respect to the plaintiff's erection of a fence was harmless.

The substitute defendant further claims, however, that the court's clearly erroneous finding "tainted its interpretation of the remaining evidence" in that "there can be no reasonable doubt that the trial court's erroneous finding concerning the fence strongly influenced its determination to ignore" other evidence favorable to the substitute defendant. We conclude that her claim is without merit. The substitute defendant fails to point to any specific portions of the record that support her claim,[15] and our thorough review of the record has not disclosed any. In fact, the court made a single reference in its opinion to the fence being erected in 1985 and in

---

[14] Although we note that the substitute defendant argues that other evidence in the record reflects that the plaintiff in fact had permission from the record owner to use the disputed area, we reiterate that the record sufficiently supports the court's finding that the plaintiff's use was without permission.

[15] Rather, the substitute defendant merely speculates that the court's decision to credit certain witnesses' testimony could have been influenced by its mistaken belief that the plaintiff had erected a fence shortly after 1985.

no way suggested that that fact was central to its analy-
sis or impacted its findings as to other facts. Conse-
quently, our review of the record convinces us that the
court did not place significant emphasis on its finding
regarding the construction of the fence. Rather, the
court's findings as to the plaintiff's consistent and exten-
sive actual use of the property without the permission of
the substitute defendant or her predecessors in interest
fully support the court's conclusion, regardless of whether
the plaintiff constructed a fence in 1985 shortly after
he acquired 31 Edgewood Avenue.

## II

Next, the substitute defendant claims that the court
clearly erred in finding that the plaintiff's possession
was under a claim of right in that the court "ignored and
otherwise implausibly explained away evidence that
easily should have overcome the clear and convincing
standard of proof that the [substitute] plaintiff needed
to attain . . . ." The substitute defendant advances this
argument with respect to several portions of the eviden-
tiary record. We address each in turn.

## A

The substitute defendant first argues that the court
clearly erred in finding that the plaintiff's use of the
disputed area was under a claim of right when the
evidence proved that the plaintiff, after commissioning
a survey of 31 Edgewood Avenue in 1987, "twice
expand[ed] and/or replac[ed] the outbuildings located
in the rear of [31 Edgewood Avenue] . . . right up to
the deeded property line and not beyond."[16]

---

[16] In support of her claim, the substitute defendant appears to suggest
that the court, in reaching its conclusion that the substitute plaintiff satisfied
her burden in proving the elements of adverse possession, failed to consider
this evidence entirely. Specifically, she argues that the court "never even
mentioned the existence of the 1987 survey in its decision except to make
a passing reference . . . [to establish chain of title]" and that it "did not
discuss the rather detailed evidence that while the [plaintiff] expanded the
existing outbuildings . . . [he] did not place either of the structures in the
disputed area . . . ." (Citation omitted.)

The following facts, as set forth by the trial court, are relevant to this claim. "The shed, garage and extensions thereof located at the rear of 31 Edgewood Avenue, directly on the property line . . . were used by [the plaintiff] for his landscaping business. Repairs to the garage roof, the siding and an extension to the garage were constructed by [the plaintiff] after 1985, which required access to the disputed area for their construction. The garage roof was added in 1997. New siding was placed on the shed to match the siding on the main house at 31 Edgewood Avenue.[17] Siding required the contractors to access and use the disputed area during the construction. When [the plaintiff] was asked on direct examination on the first day of trial what was behind the garage and shed, he immediately answered that he considered it to be a part of the 31 Edgewood Avenue

In reviewing factual findings, "we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 346 Conn. 391, 414, 291 A.3d 64 (2023). "We cannot assume that the court's conclusions were reached without due weight having been given to the evidence presented and the facts found." (Internal quotation marks omitted.) *Moye* v. *Commissioner of Correction*, 168 Conn. App. 207, 229, 145 A.3d 362 (2016), cert. denied, 324 Conn. 905, 153 A.3d 653 (2017). Here, the court stated in its memorandum of decision that its "conclusion as to the status of the disputed area and its use is based upon surveys, deeds, aerial photographs, and [witness testimony]." Because the substitute defendant has failed to show otherwise, we presume that the court properly considered all relevant evidence in making its factual findings and reaching its conclusions.

[17] The substitute defendant claims that the court's factual finding with respect to the addition of new siding on the shed was clearly erroneous. We disagree. In support of her claim, the substitute defendant acknowledges that the substitute plaintiff testified on direct examination that new siding had been added to the shed but argues that the substitute plaintiff "conceded during cross-examination that the shed had in fact been replaced" rather than repaired. We reiterate that "[i]t is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, *crediting some, all or none of any given witness' testimony*." (Emphasis added; internal quotation marks omitted.) *Kiniry* v. *Kiniry*, supra, 299 Conn. 329. Thus, we cannot conclude that the court clearly erred to the extent that it accorded greater weight to the substitute plaintiff's testimony on direct examination.

property." (Footnote added.) Additionally, neither party disputes that in 1987, the plaintiff commissioned a land survey of 31 Edgewood Avenue.[18] The plaintiff testified that he had commissioned that survey "[t]o repair the terrace." When asked on cross-examination whether he had looked at the 1987 survey, the plaintiff responded: "I don't have a license. I don't have experience in this, and maybe I . . . didn't school long enough to read the numbers." In response to a follow-up question regarding whether he "could read the maps," the plaintiff answered, "[n]o."

The substitute defendant argues that the plaintiff "likely knew of . . . Evans' ownership of the disputed area because of [his] own 1987 survey . . . ." It is evident, however, from the court's findings, namely, that the plaintiff believed he owned the disputed area and that he had "limited use of English," that the court credited the plaintiff's testimony that he was not aware from the 1987 survey that Evans owned the disputed area. The credibility of a witness is a matter exclusively for the trier of fact, and, therefore, such credibility determinations by the trial court are outside our limited scope of review.

In addition, it does not appear from the record before us that any witness testified as to the reason the outbuildings were expanded in the manner that they were. In the absence of such evidence, the substitute defendant's assertion that the plaintiff's decision to expand the outbuildings only to the deeded boundary disproves the hostility of his possession is mere speculation.[19]

[18] The 1987 survey was admitted as a full exhibit. Although the survey did not show the disputed area, it depicted the boundary line between 31 Edgewood Avenue and 52 Oak Ridge Street.

[19] We further note that this evidence is susceptible to reasonable inferences other than the one endorsed by the substitute defendant, including that the plaintiff's reason for not expanding the outbuildings farther was to avoid interfering with his other uses of the disputed area. We reiterate that the plaintiff used the disputed area for storage, parking, and "as a construction facility" for his landscaping business. In addition, the court found that the

Moreover, even if the court had accepted the substitute defendant's interpretation of that evidence, it would not have precluded the court from according greater weight to contrary evidence. The court was presented with ample evidence, as set forth in part I of this opinion, indicating that the plaintiff used the disputed area under a claim of right, including the plaintiff's own testimony, which the court credited, that he believed that he owned the disputed area. In particular, we reiterate that the court found, and the record supports, that the plaintiff twice installed asphalt within the disputed area and did not inform Evans or request her permission on either occasion. Because this evidence was sufficient to support the court's finding that the plaintiff used the disputed area under a claim of right, the substitute defendant's claim fails.

B

Next, the substitute defendant argues that "[t]he trial court erred by not accepting" the substitute plaintiff's "admission" that any use of the disputed area was pursuant to a verbal agreement with Evans, as evidenced by a 2019 police report that was admitted as a full exhibit at trial. The following facts, as set forth by the trial court, and procedural history are relevant to this claim.

On June 15, 2019,[20] Greenwich police officer Stephen Podmokly was called to 52 Oak Ridge Street to resolve

only vehicle access to the adjacent lot leased by Pirri was "along the driveway of 31 Edgewood Avenue . . . then between the garage and shed located at the rear of the property onto the disputed area, and then a turn onto the rear of [27 Edgewood Avenue] from the disputed area."

[20] We note that the court initially stated in its memorandum of decision that Podmokly was called to the property on June 19, 2019. Every subsequent reference therein, however, stated that the call occurred on June 15, 2019. Although neither party addresses this discrepancy, we conclude from our review of the record that Podmokly was called to 52 Oak Ridge Street on June 15, 2019, and that the court's initial reference to June 19, 2019, was a scrivener's error.

a property dispute. After arriving, Podmokly spoke with the defendant and the substitute defendant and subsequently spoke with the substitute plaintiff over the phone. Podmokly's written incident report stated in relevant part: "The undersigned spoke with [the substitute plaintiff], the owner of 31 Edgewood [Avenue] who related [that] they have used [the disputed area] and taken care of it for the last [thirty-five] years. That there was a verbal agreement with the previous homeowner of 52 Oak Ridge [Street]. [The substitute plaintiff] related [that] she was advised by her attorney that [the disputed area] was in fact her property and [she] would go to court if necessary."[21]

At trial, Podmokly testified with respect to the report and his recollection of the incident. Additionally, the substitute plaintiff testified regarding her alleged statement in the report concerning "a verbal agreement with the previous homeowner of 52 Oak Ridge [Street]." She stated that, in 2016 or 2017, she and the plaintiff met with Attorney Patrick R. Gil to discuss acquiring title to the disputed area from Evans.[22] The substitute plaintiff

---

[21] We note that the substitute plaintiff objected to the admission of her statements in the police report at trial on the ground that they were inadmissible hearsay because she was not a record owner of 31 Edgewood Avenue at the time that she spoke with Podmokly. The court overruled her objection and admitted her statements pursuant to § 8-3 (1) (G) of the Connecticut Code of Evidence, which provides as an exception to the hearsay rule "a statement made by a predecessor in title of the party, provided the declarant and the party are sufficiently in privity that the statement of the declarant would affect the party's interest in the property in question." The substitute plaintiff does not challenge the court's ruling on appeal, and we therefore do not address it.

[22] The court noted in its memorandum of decision that Gil had represented the plaintiff in a "prior litigation between the [plaintiff] and . . . Evans . . . . It commenced . . . October 24, 2017. That court record was not offered in evidence although there was some testimony from [the substitute plaintiff] regarding that litigation. The lis pendens from that . . . litigation, dated November 28, 2017, was in evidence." Gil was not called by either party as a witness, and the court found that "[n]either [the plaintiff nor the substitute plaintiff] testified credibly as to the nature of any conversation between . . . Gil and . . . Evans." The court also found, however, that

explained that her statement regarding "a verbal agreement" reflected in the report was in reference to an agreement that Gil had reached with Evans wherein Evans agreed to transfer the disputed area to the plaintiff upon her death.[23]

In its memorandum of decision, the court stated: "[Podmokly] at trial admitted that he had no independent recollection of what [the substitute plaintiff] told him other than what is in the June 15, 2019 written report . . . . [He] did admit that he did not ask [the substitute plaintiff] the specifics about the so-called verbal agreement contained in [his police report]. . . .

"[The substitute plaintiff] had some knowledge at the time that she spoke to [Podmokly] on June 15, 2019, that . . . Gil had reached an understanding with . . . Evans that the disputed area . . . was going to be transferred to [the plaintiff's] title upon the death of . . . Evans. Such an agreement was never reduced to writing . . . . This was the 'agreement' that [the substitute plaintiff] was referring to in her telephonic conversation with [Podmokly]. Neither [the plaintiff nor the substitute plaintiff] ever entered into any verbal agreement directly with . . . Evans. [The substitute plaintiff] testified that she did inform [Podmokly] . . . that [the plaintiff's] lawyer had been involved in the agreement, not [herself or the plaintiff] individually." (Citations omitted.)

---

"[the plaintiff] credibly testified that his health was the reason that the lawsuit against . . . Evans was withdrawn." The court further found, with respect to the prior action, that the plaintiff and the substitute plaintiff first authorized Gil to contact Evans in 2016, sixteen years after the plaintiff's adverse possession rights to the disputed area had vested in 2000.

[23] Specifically, the substitute plaintiff testified: "[Gil] had the conversation with . . . Evans. [Gil] . . . had an agreement with . . . Evans that she was going to transfer the property to us before she died. I never spoke to . . . Evans. I never had a conversation, and I never said that she gave me permission. She gave [Gil] the permission. She told [Gil] that she was going to transfer the property to us before she died, but I never had the conversation with her, and I never said that . . . Evans gave me the permission."

It is thus apparent from its memorandum of decision that the court, in weighing the conflicting evidence before it, credited the substitute plaintiff's testimony with respect to what she meant by "a verbal agreement . . . ."[24] Her testimony was consistent with the plaintiff's testimony, which the court credited, that he had never spoken to Evans. The substitute defendant, in arguing that the court should have accepted her interpretation of the evidence, essentially urges us to second-guess the court's credibility determinations and reweigh conflicting evidence, which we cannot do. Consequently, we cannot conclude that the court's finding as to what the substitute plaintiff meant when talking to Podmokly was clearly erroneous.

## C

Finally, the substitute defendant argues that the deposition testimony of Pirri demonstrated that Evans had given the plaintiff permission to use the disputed area.[25]

---

[24] The substitute defendant further argues that the court's finding that the substitute plaintiff, in June, 2019, was referencing an agreement with Gil is belied by the fact that "the [plaintiff] and . . . Evans were unable to reach such an agreement . . . prior to [Evans'] death" in September, 2017. (Citation omitted.) In weighing the evidence before it, however, the court determined that the substitute plaintiff merely had "*some* knowledge" of that action. (Emphasis added.)

Moreover, the court emphasized that the substitute plaintiff had testified, and the police report indicates, that she told Podmokly that her attorney had advised her that the disputed area is in fact her property. In assessing her testimony, the court further considered a May 28, 2019 letter from Gil to the defendant and the substitute defendant, which was admitted as a full exhibit, that stated in relevant part: "This office represents [the plaintiff], a neighbor and abutting land owner to the rear of the property at 52 Oak Ridge [Street]. . . . It is clear to me that [the plaintiff] has satisfied the requirements for adverse possession of [the disputed] area. . . . We attempted to reach a fair settlement of that lawsuit with the prior owner but were unsuccessful. My client temporarily withdrew the lawsuit with the hopes that he could negotiate a fair settlement with the future owner of the property." In crediting the substitute plaintiff's testimony, the court found that Gil's letter "is not inconsistent with the . . . limited facts possessed by [the plaintiff and the substitute plaintiff] regarding the 'agreement.' "

[25] The substitute defendant points specifically to the following portions of Pirri's deposition testimony: (1) he "probably met" Evans four times and

By way of background, the substitute defendant called Pirri as a witness at trial, and, at several points during Pirri's direct examination, the court admitted portions of his deposition testimony for impeachment purposes as prior inconsistent statements. On appeal, the substitute defendant claims that the court reviewed Pirri's deposition testimony and inconsistent trial testimony but "dismissed it entirely."[26]

The substitute defendant's claim, however, is belied by the court's memorandum of decision, in which it thoroughly addressed Pirri's deposition and trial testimony. Specifically, it noted that Pirri's deposition testimony "conflicted with some portion of his trial testimony" but concluded that "[t]he fact that [Pirri's] statements made in a pretrial deposition conflict with his trial testimony goes to his personal credibility but otherwise [is] not relevant and binding on [the substitute plaintiff's] claims of adverse possession." Moreover, the court specifically addressed each portion of Pirri's deposition testimony cited by the substitute defendant on appeal and found that much of it either was incomplete or too vague "to be persuasive on the proof of permission . . . ."[27] In any case, even if the court had

"became kind of friendly with her"; (2) Evans "knew and . . . was fine with [the plaintiff] using the [disputed area]"; (3) the plaintiff "probably had a few discussions [with Evans] possibly"; and (4) "later on in the 2000s," the plaintiff became interested in purchasing the disputed area from Evans.

[26] In support of her claim, the substitute defendant incorrectly argues that "[i]t [was] . . . not [her] burden of proof to prove permission" because "it [was] the [substitute] plaintiff's burden to prove a claim of right and a hostile and adverse use by clear . . . and convincing evidence." As stated herein, the substitute plaintiff was not required to prove a lack of permission; rather, the substitute defendant, pursuant to her special defense, had the burden to prove permission by a preponderance of the evidence. See *Slack* v. *Greene*, supra, 294 Conn. 435.

[27] With respect to Pirri's deposition testimony that the plaintiff "probably had a few discussions" with Evans about the disputed area, for example, the court stated: "There was no direct evidence that [the plaintiff], who had difficulty speaking English, ever had a specific businesslike meeting with . . . Evans on the subject of the disputed area. [Pirri] never testified that he saw them together. The dates or circumstances of any meeting were

found Pirri's deposition testimony to be credible and probative on the issue of permission, it is evident from its memorandum of decision that it accorded greater weight to the plaintiff's own testimony than to any potentially conflicting testimony by Pirri.[28] It is axiomatic that we must defer to factual findings made by the trial court on the basis of its assessment of witnesses' credibility and its weighing of conflicting evidence where, as we conclude here, such findings are supported by sufficient evidence. Accordingly, we conclude that the court's finding that the plaintiff possessed the disputed area under a claim of right was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

––––––––––––––––––––

missing [from] this testimony. It would be speculation to find that those meetings, if they occurred, took place within the fifteen year [statutory] period [for adverse possession]."

[28] We emphasize that Pirri's deposition testimony directly conflicted with the plaintiff's testimony, which the court credited, that he never had a conversation with Evans or any other owner of 52 Oak Ridge Street and that he never sought or received permission from anyone to use the disputed area, which was further corroborated by the substitute plaintiff's testimony. In considering Pirri's deposition testimony, the court stated that "[n]o evidence was produced that . . . [Pirri] had the authority to bind [the plaintiff] by any statements [he] made . . . to . . . Evans at any time. . . . Inconsistent statements by a person with no authority from the principal cannot bind the principal merely because their statements are not credible due to inconsistencies." Accordingly, because the court credited the contrary testimony of the plaintiff, it concluded that "[t]he [substitute] defendant cannot rely [on] any portion of [Pirri's] testimony or inconsistent deposition answers to sustain her burden to prove . . . [that] Evans gave permission to [the plaintiff] during the fifteen [year statutory period]" to use the disputed area.